UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ) <br> LAMONTE DIXON, ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> RANDY PFISTER,[1] ) <br> ) <br> Respondent. ) | Case No. 09 C 3197 <br><br> Judge Joan B. Gottschall |

## **MEMORANDUM OPINION & ORDER**

Lamonte Dixon, Jr., ("Dixon") challenges his conviction pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the court denies the petition.

### **I. BACKGROUND**[2]

In August 2003, a grand jury charged Dixon with two counts of intentional first-degree murder and two counts of knowing first-degree murder based on allegations that on or about May 1, 2003, he "personally discharged a firearm that proximately caused the death of Teri Clark." In February 2004, the trial court held a jury trial. The testimony was as follows. Gregory Mills, an investigator with the Champaign County sheriff's office, testified he and another investigator, Curtis Apperson, interviewed Dixon on August 18, 2003. They began the interview by informing Dixon they suspected he killed

---

[1] The court substitutes the current warden of Pontiac Correctional Center as the proper party respondent pursuant to Rule 2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254 and Fed. R. Civ. P. 25(d)(1).

[2] The court takes most of its facts from the Illinois Appellate Court's recitation in *People v. Dixon*, 835 N.E.2d 925 (Ill. App. Ct. 2005) and in *People v. Dixon*, No. 4-06-0862 (Ill. App. Ct. 2008) (Ex. J, ECF No. 14-11). *See Morgan v. Hardy*, 662 F.3d 790, 797-98 (7th Cir. 2011) ("We presume state factual findings to be correct, unless the petitioner rebuts the presumption by clear and convincing evidence. The presumption of correctness also applies to factual findings made by a state court of review based on the trial record.") (citations omitted). Additional uncontroverted facts from the record are also included where helpful.

Clark. Dixon replied it was a mistake, as he did not know anyone by that name. Apperson then showed Dixon a picture of Clark, and Dixon said he did not recognize her. The picture was left in Dixon's view. The investigators then asked Dixon if he knew someone by the name of Tick, and Dixon replied he did not. When asked if he knew Melvin Moore (whose alias was Tick), Dixon also denied knowing him. Dixon sat there for a moment, and then stated he knew Clark through "Tick." The investigators stopped the interview to allow Dixon to speak with his girlfriend. Because they had difficulty reaching Dixon's girlfriend, the investigators eventually told Dixon they needed to return to the topic of Clark's murder and hear his side of the story. Dixon put his head down and started rubbing his eyes.

At that point, Mills suggested Clark's death might not have been Dixon's fault—it could have just been an accident. Dixon put his head down but did not respond. Apperson followed up by suggesting that Clark's death might not have been entirely Dixon's fault. Dixon again put his head down, and Apperson asked Dixon whether he killed Clark. Dixon responded, "yes." The investigators then asked Dixon to tell them what happened. Dixon said it was an accident and the shooting was Tick's fault, not his. Dixon explained he, Tick, and Clark were outside a car, and Clark was shot three times. Tick stated Clark had set them up and she needed to go.

After giving the overview of Clark's death, Dixon began explaining what happened earlier in the evening of the murder. Tick, Clark, a person who went by the name of Kelly (Terrence Norwood's alias), Kim Bromley, and Dixon decided to rob a person staying at the Ameri Inn in Champaign, Illinois. The plan was for Clark to knock on the door; Dixon, Tick, and Kelly to rush in the room when the victim answered the

door; and Bromley to drive the getaway car. Dixon said that Tick had a weapon. The group executed the robbery as planned, but did not get any drugs or money from the victim. Tick was very upset with Clark, who had selected the victim, and accused her of setting them up. After the robbery, Bromley drove the group toward Rantoul, Illinois.

While they were riding in the car, Tick gave Dixon Tick's weapon. At some point, Dixon asked Bromley to stop the car so Dixon could question Clark to determine if she had set them up. Dixon and Clark got out of the car, and Dixon pointed the gun at Clark and asked her to tell the truth. Crying, Clark denied setting anyone up. Dixon believed her, and they both got back in the car. Dixon then gave the weapon back to Tick, and Bromley began to drive.

But Tick did not believe Clark; he told Bromley to stop the car again. This time, Dixon, Clark, and Tick exited the car. Dixon pointed the gun at Clark, intending to get her to tell the truth about whether she had set them up. He was five feet from Clark and was questioning her. As he questioned her, the weapon went off. Dixon could tell Clark had been hit because she fell. Clark began pleading for help. Dixon was upset with Tick, as Dixon had not known the gun was loaded. Tick told Dixon he needed to finish the job. Dixon told Clark he was sorry, then fired two more shots. He and Tick got back in the car, and they left the area. Dixon gave Tick the weapon, and Tick got rid of it.

The investigators asked Dixon to describe the weapon he used to kill Clark. Dixon described it as an old western gun that had to be physically cocked before it could fire. After Dixon identified Moore/Tick in a photographic· lineup, he agreed to give a taped statement.

In his August 18, 2003, taped statement, Dixon said he was "super high" on weed and crack the night of the attempted armed robbery. When the car stopped for the first time, Tick pulled Clark out of the car, and Dixon followed. Tick handed him a pistol, which Dixon had been informed did not have any bullets. Dixon "got in Clark's face," trying to intimidate her to see if she had set them up. Dixon believed Clark's statement she had not set them up and instructed her to get back in the car. Everyone got back in the car, Dixon gave the gun back to Tick, and they drove away.

However, Tick did not believe Clark and instructed Bromley to stop the car again. Dixon, Tick, and Clark all exited the car, and Dixon grabbed the gun from Tick. He was trying to pressure Clark into telling the truth. Dixon continued to intimidate her to the point she was "scared to death." Tick told Dixon to "G-merk her"; Dixon later explained that "merk" meant "kill." Dixon wondered how Clark could die if the gun did not have bullets in it. The next thing he knew, he accidentally pulled the trigger, and the gun went off. He and Tick both jumped back. Dixon stated it was a mistake and an accident. He denied he intended to shoot Clark. The bullet hit Clark—Dixon did not know where—and she staggered back and fell.

Dixon apologized to Clark and asked what he could do. Clark stated she could not breathe and asked for help. Her voice was "raspy" at the time. Tick then told him to finish her off. Dixon was a distance from Clark. He described his subsequent actions as follows: "I busted the first time it clicked and then I, I cocked it, I shot, I cocked it, I shot[,] and jumped in, and jumped in the car." Dixon admitted he intended to kill Clark with the second two shots. Dixon also stated Tick had a gun, and Dixon believed Tick

4

would shoot him if he did not kill Clark. Dixon stated that, when they left, Clark was still in the roadway asking for help.

Bromley testified to a slightly different set of events. She indicated no one got out the first time she stopped the car in the country because a truck had approached. The second time she stopped the car, Dixon ordered her to turn off the lights. Dixon then ordered Clark out of the car, saying he was going to make her walk home. Kelly also exited the car. Once the three were outside of the car, Tick asked Bromley to turn the radio up. While Bromley did not hear anything, she saw four or five "flashes coming from the passenger side window" where she had seen Dixon standing. Dixon and Kelly got back in the car, and Dixon told Bromley to turn on the lights and drive away. As she did so, Bromley looked in the rearview mirror and saw Clark standing and bloodied. Bromley screamed and stopped the car. Dixon and Kelly got out of the car. Dixon walked to the rear of the car and fired two shots. When Dixon got back in the car, she saw Dixon stuffing a gun in his pants.

Norwood (Kelly) gave a recollection similar to Dixon's statement of the events. However, he testified he had obtained the weapon for Dixon from his neighbor. Kelly observed the cartridge casings in the gun before he gave it to Dixon, who placed the gun in the waistband of his pants. Kelly also said everyone in the car was quiet as Bromley drove out into the country. Kelly also testified that Dixon and Clark were the only two people standing outside of the car at the two stops. At the second stop, Dixon pointed the gun at Clark, and she begged him not to kill her. Kelly then heard three or four gunshots. Dixon got back in the car still holding the gun, and Bromley drove away leaving Clark in the middle of the road.

Dr. Violette Hnilica, a forensic pathologist, performed Clark's autopsy. Dr. Hnilica described Clark as "very slight in build." Dr. Hnilica testified Clark sustained three gunshot wounds, one behind her right ear, one on the back right shoulder that exited the side of the shoulder, and one above the left breast. Dr. Hnilica could not determine the timing of the three wounds. Only the bullet that caused the chest wound was recovered from Clark's body. Dr. Hnilica opined that neither the shoulder nor the head wound would have been fatal: the head wound was just "a graze" and did not cause internal bleeding, and the shoulder wound most likely would not have been fatal because the gunshot only damaged skin and soft tissue. Dr. Hnilica indicated the chest wound was the fatal one, as that bullet caused massive hemorrhaging by perforating the right lung and heart. Dr. Hnilica concluded that death would have occurred within four minutes, and with the amount of internal bleeding, Clark would have lost consciousness in less than a minute. Dr. Hnilica opined the cause of Clark's death was multiple gunshot wounds with the chest wound being more rapidly fatal than the other two.

At trial, Dixon's counsel requested that the judge instruct the jury on involuntary manslaughter. The judge refused the request, noting that although Dixon stated the first shot was an accident, he admitted he intended to kill Clark with the next two shots. A jury then convicted Dixon on one count of first-degree murder.

In March 2004, Dixon filed a posttrial motion. The trial court denied that motion at a joint hearing in April 2004, and sentenced him to sixty-five years' imprisonment, which included a twenty-five-year sentence enhancement. Dixon filed a motion to reconsider the sentence, which the court denied. On direct appeal, Dixon asserted that the twenty-five-year sentence enhancement was inapplicable to his case, violated the Due

Process Clause and the Proportionate-Penalties Clause of the Illinois Constitution, and constituted an improper double enhancement. The appellate court affirmed his sentence, *see Dixon*, 835 N.E.2d at 932, and the Illinois Supreme Court denied his petition for leave to appeal ("PLA"), *see People v. Dixon*, 844 N.E.2d 42 (Ill. 2005).

Meanwhile, Dixon filed a *pro se* post-conviction petition in which he raised a plethora of issues. Once counsel was appointed, he amended his petition. Relevant here, he argued that he was denied effective assistance of appellate counsel. In particular, he alleged that his appellate counsel was ineffective by failing to challenge the trial court's refusal to give an involuntary manslaughter instruction. The State filed a motion to dismiss that petition in May 2006, and after a hearing, the trial court granted that motion. On appeal, Dixon raised the same issue, and the appellate court affirmed. Dixon then filed a PLA to the Illinois Supreme Court, which was denied in May 2008. Dixon now raises the ineffective assistance claim in his petition to this court.

## II. LEGAL STANDARD

As the Supreme Court has repeatedly emphasized, "a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) (quoting *Wilson v. Corcoran*, 131 S.Ct. 13, 15 (2010)); *see Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), further narrows a reviewing court's inquiry. Under the AEDPA, once a petitioner's claim is "adjudicated on the merits in State court proceedings," a federal court can grant relief only where the challenged state court decision is "contrary to" or "an unreasonable application of"

clearly established federal law as determined by the Supreme Court of the United States. *See Greene v. Fisher*, 132 S.Ct. 38, 42 (2011); *Cheeks v. Gaetz*, 571 F.3d 680, 684-85 (7th Cir. 2009). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision involves an "unreasonable application" of clearly established federal law where the court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 65 (2003).

Under § 2254(d)(2), a challenge to the state court's factual determinations "will not succeed unless the state court committed an 'unreasonable error,' and § 2254(e)(1) provides the mechanism for proving unreasonableness." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008). Section 2254(e)(1) establishes that factual findings based on the trial record—whether made by the state trial court or by the state court of review—are presumed correct unless the petitioner rebuts that presumption by clear and convincing evidence. *Ben-Yisrayl*, 540 F.3d at 546. Where the state court's decision "rests upon a determination of fact that lies against the clear weight of the evidence, however, that decision is by definition, a decision so inadequately supported by the record as to be . . . objectively unreasonable." *Id.* at 549 (quoting *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) (internal quotation marks omitted)).

Before a federal court may evaluate the merits of a habeas corpus petition, the petitioner must have exhausted his remedies before the state court. *See Harrington v. Richter*, 131 S.Ct. 770, 787 (2011) (citing 28 U.S.C. § 2254(b)). This means that a defendant "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (describing Illinois' appellate procedures).

In addition, "'[a] habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim.'" *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008) (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004)). Federal review also is precluded when the state court's decision rests on an adequate and independent state law ground, *see Promotor v. Pollard*, 628 F.3d 878, 885 (7th Cir. 2010), because where an independent state ground supports the judgment, a ruling on the federal claims would be advisory. *See Harrington*, 131 S.Ct. at 787; *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009) ("[W]hen a state refuses to adjudicate a petitioner's federal claims because they were not raised in accord with the state's procedural rules, that will normally qualify as an independent and adequate state ground for denying federal review.") (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

### III. ANALYSIS

The thrust of Dixon's argument is as follows. He argues that his first shot at Clark must have been the fatal shot that hit her lungs, because Clark's "reaction to that shot was consistent with the pathologist's description of the effect such a wound would

9

have on a person"—he says that Clark "staggered back and fell," and "she could not breathe." (Pet. at 9.) Dixon says he did not intend to kill Clark with that first shot. While he freely admits that he intended to kill Clark with his second and third shots, he claims that he was "super high" and he did not know the gun was loaded when he first fired at Clark. (*Id.*) Thus, he argues that he was entitled to the involuntary manslaughter jury instruction as a matter of law, and that his appellate counsel was ineffective by failing to challenge the trial court's ruling on direct appeal.

The Illinois Appellate Court rejected this ineffective assistance claim, and it is that court's decision that is presently under review. *See Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011) ("The relevant decision for purposes of our assessment under AEDPA is the decision of the last state court to rule on the merits of the petitioner's claim."). Although Dixon does not frame his argument in terms of the standards set out in the AEDPA, this court must read Dixon's *pro se* petition liberally. *See Lewis v. Sternes*, 390 F.3d 1019, 1027 (7th Cir. 2004). This court will presume that Dixon is arguing that the Illinois Appellate Court acted contrary to, or unreasonably applied, clearly established federal law as set out in *Strickland v. Washington*, 466 U.S. 668, 672 (1984). *See* 28 U.S.C. § 2254(d)(1). As Dixon's entire claim hinges upon his contention that the first shot was the fatal shot, this court will also presume that Dixon is arguing that the Appellate Court unreasonably determined that the first shot was *not* the fatal shot. *See* 28 U.S.C. § 2254(d)(2). The court addresses the issues together.

As Dixon brings his claim under *Strickland*, he faces an uphill battle. Not only do courts generally defer to the strategic choices made by counsel, but under the AEDPA this court owes significant deference to the state court decision. *See Cullen v. Pinholster*,

131 S.Ct. 1388, 1403 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (noting the "doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard"). Here, the appellate court properly recognized the controlling federal standard for ineffective assistance of counsel as set out in *Strickland*: Dixon had to show that his counsel's failure to raise the issue on appeal was objectively unreasonable, and that Dixon suffered prejudice a result. The court also properly noted that appellate counsel was not required to brief every conceivable issue on appeal. *See Knowles*, 556 U.S. at 123 ("[T]his Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success."). Consequently, the appellate court's decision was not "contrary to" clearly established federal law. *See Williams*, 529 U.S. at 405.

The question then becomes whether the appellate court's application of *Strickland* to these facts was "objectively unreasonable." *Lockyer*, 538 U.S. at 65. The court began its inquiry by asking whether Dixon suffered any prejudice as a result of counsel's failure to raise the issue on appeal. The court recognized that whether to give a particular jury instruction is a matter committed to the trial court's "sound discretion," and it only abuses that discretion if it refuses to instruct on a lesser offense and credible evidence supports such an instruction. The court also noted that the question of whether an involuntary manslaughter instruction is warranted depends on the particular facts and circumstances of each case. In Illinois, involuntary manslaughter occurs when "a defendant unintentionally kill an individual by recklessly performing acts that are likely to cause death or great bodily harm." *People v. Jones*, 845 N.E.2d 598, 614 (Ill. 2006); *see also* 720 Ill. Comp. Stat. 5/4-6 (defining "recklessness"). Where a killing's "nature,"

11

as evidenced by multiple wounds or a victim's defenselessness, demonstrates a lack of recklessness, an involuntary manslaughter instruction is typically not warranted.

The appellate court then turned to Dixon's theory that the first shot had to be the fatal shot. The court concluded that the record lacked credible evidence on this issue for two reasons: First, Dr. Hnilica specifically testified that she could not determine the sequence of the three wounds. Second, although Dixon described Clark's reaction upon receiving the first shot as consistent with the chest wound, he also described her talking and crying for a relatively long period of time between the first shot and the later two shots—behavior inconsistent with Dr. Hnilica's testimony that Clark would have been rendered unconscious within a few seconds of receiving the chest wound. While this may not constitute a factual finding under § 2254(d)(2)—instead, the appellate court seems to be saying that there simply was not credible evidence to support Dixon's point—Dixon has not established by clear and convincing evidence that the appellate court was wrong.

The appellate court noted various inconsistencies in Dixon's claim to have "accidentally" pulled the trigger the first time. Dixon repeatedly stated that the gun was an old-fashioned type that had to be cocked before it would fire. However, he never mentioned that he had cocked the gun before pointing it at Clark while attempting to scare her, although he expressly mentioned this fact when he spoke of the later two shots. Dixon's credibility was also significantly undercut by the fact that he had initially denied even knowing Clark or having anything to do with her homicide.

In addition to these credibility issues, the court noted that there were multiple wounds, and that Dixon admittedly possessed the requisite intent for at least some of

those injuries. Because the facts overwhelmingly demonstrated that Clark's death was the result of intentional murder, no jury could conclude that Dixon was guilty of only involuntary manslaughter. This meant, of course, that the trial court did not abuse its discretion by refusing to give such an instruction.[3] It also meant that appellate counsel did not deprive Dixon of effective assistance of counsel by failing raising the claim on direct appeal.

The appellate court properly applied relevant federal law to evaluate whether Dixon could succeed on his claim, and it reasonably concluded that he had suffered no prejudice under *Strickland*. The appellate court was well within the realm of reasonableness when it determined that the evidence at trial did not support Dixon's theory of the case. This court certainly can not say that the appellate court acted in an objectively unreasonable fashion. As a result, the court must deny Dixon's petition.

## IV. CONCLUSION

For the reasons set forth above, Dixon's petition for a writ of habeas corpus is denied.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: April 10, 2012

---

[3] The appellate court also stated that even if the trial court did err in refusing to give the involuntary manslaughter instruction, the error would have been harmless. Because this court concludes that it must defer to the appellate court's determination that the trial court did not abuse its discretion, it does not reach the harmless error analysis.